# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | 3:73-CV-127-ECR (RAM) |
|  ) | In Equity No. C-125-ECR |
| Plaintiff, ) | Subfile No. C-125-B |
|  ) | |
| WALKER RIVER PAIUTE TRIBE, ) | |
|  ) | |
| Plaintiff, Intervenor ) | **ORDER** |
|  ) | |
| vs. ) | |
|  ) | |
| WALKER RIVER IRRIGATION ) | |
| DISTRICT, et al., ) | |
|  ) | |
| Defendants. ) | |

This case centers around a water rights dispute and involves a multitude of parties. The court established confidential mediation proceedings to take place every six months in order to facilitate the settlement of certain issues. (Doc. #566, Attach. 1.[1]) The mediating parties also entered into a private contract to that effect, the Mediation Process Agreement (hereinafter "MPA"). (*Id.* at Attach. 2.) Individual stakeholders were not invited to participate. (*Id.* at Attach 1.)

Attorney Gordon DePaoli represents the Walker River Irrigation District (hereinafter "WRID") and several individual stakeholders in this case. Defendants Joseph and Beverly Landolt (hereinafter "the Landolts") filed a Motion to Disqualify Mr. DePaoli from participating in this case on November 28, 2005 due to his multiple representation. (Doc. #795.) A Joint Response was filed on

---

[1] The citations to the court's order governing the mediation process and the Mediation Process Agreement are to attachments of Docket #566 in case 3:73-CV-00125-EDR-RAM. All other docket citations are to case number 3:73-CV-00127-ECR-RAM.

January 26, 2006 (Doc. #824) by the United States, the States of Nevada and California, the Walker River Paiute Tribe, Mono County, Lyon County, Mineral County, and the Walker Lake Working Group. WRID filed a separate response on January 30, 2006 (Doc. #826). The Landolts replied on February 21, 2006. (Doc. #835.) Oral argument was heard on the motion on March 7, 2006.

## STATEMENT OF FACTS

Briefly, the Walker River is an unnavigable stream beginning on the eastern slopes of the Sierra Nevada mountains in California. *United States v. Walker River Irr. Dist.*, 104 F.2d 334, 335 (9th Cir. 1939). Lands along the river require irrigation in order to be productive. *Id.* There are numerous claimants to the Walker River's water rights. This case involves claimants to both the surface and underground water. (Doc. #826 at p. 8.)

A. The Parties

This case involves many parties, such as the United States, the Walker River Paiute Tribe, the WRID, the State of Nevada, the State of California, Mineral County (Nevada), Lyon County (Nevada), Mono County (California), the Walker River Working Group, and numerous individual stakeholders. The following is only a brief summary of the relevant parties to this Motion, WRID and the individual stakeholders.

(1) Walker River Irrigation District

WRID is being represented in this matter by Mr. DePaoli. WRID was created by statute in 1919. *See* Nev. Rev. Stat. §§ 539.010, 539.013(2) (2005). It owns, operates, and holds legal title to the water rights for Bridgeport and Topaz Reservoirs. *See Mineral County v. Nevada ex rel. Dept. of Conservation & Natural Res.*, 20 P.3d 800, 804 (Nev. 2001); 45 Am. Jur. 2d *Irrigation* § 56 (2005). WRID also holds several permits relating to the Walker River surface water in Nevada called "State Certified Rights." (Doc. #826.) Generally, WRID's powers range from the ability to contract with the federal, state, and local governments, Nev. Rev. Stat. §§ 539.270, 539.273, 539.333 (2005), construct improvements, *id.* at § 539.363, buy property, *id.* § 539.207, and lease out district lands, *id.* § 539.213, among other things.

All of the district's members must be "holders of title, or evidence of title, to land susceptible of one mode of irrigation from a common source or combined sources . . . ." Nev. Rev. Stat. § 539.020(1) (2005); *see id.* §§ 539.023, 539.123; *see also id.* §§ 539.037(1), 539.107. Thus, the members are the beneficial owners of the water rights held by WRID, and they are responsible for electing, *id.* § 539.123, a five member (Doc. #826), Nev. Rev. Stat. § 539.063 (2006), board of directors from within their own membership, Nev. Rev. Stat. §§ 539.045, 539.055(2)(b), 539.113 (2006); *see also* 45 Am. Jur. 2d *Irrigation* §§ 58, 63 (2005).

### (2) Individual Stakeholders

Mr. DePaoli also represents several individual clients who are members of WRID. (Doc. #827, ¶¶ 5, 13.) No evidence has been presented by Mr. DePaoli regarding his individual clients, not even their identities. The Landolts only item of evidence in support of their Motion to Disqualify is a list of Mr. DePaoli's clients. (Decl. of Elisa Marino.) The list does not contain any information other than the clients' names. There is no information, for example, regarding what kind of water rights these people may have, or whether they are WRID board members.

### B. The Confidential Mediation Process

Due to the size and complexity of this case, the court ordered the case to be bifurcated on April 18, 2000. (Doc. #108.) The bifurcation separated the Tribal claims from the rest of the case based on the reasoning that most parties may have "many of the [same or similar] defenses to the claims of the U.S./Tribe claims . . . ." (*Id.*) The court expressly recognized, however, that "[e]xactly how the defense which overlap the claims for the [Tribe] will play out . . . is uncertain . . . ." (*Id.*)

The confidential mediation process at the focus of this controversy was established by a court order (Doc. #566, Attach. 1.) and private contract (Doc. #566, Attach. 2). These procedures were established for case management purposes, and to identify the threshold issues to the Tribal claims. (Doc. #108.) During the mediation, all proceedings and discovery have been stayed by court order. (*Id.*; Doc. #566, Attach 1.)

///

///

3

According to the court order entered on May 27, 2003:

> The Mediation Process is a confidential process. That process shall be treated as compromise negotiations under Rule 408 of the Federal Rules of Evidence[2] . . . . This Mediation Process is a "mediation" within the meaning of California Evidence Code § 1115(a).[3] The Parties to the Mediation Process are bound by and shall comply with the confidentiality provisions set forth in Paragraphs 8 and 9.3 of the [MPA]. Except as provided in Paragraph 8.3.1 of the [MPA], all Parties to the Mediation Process shall be protected from being required to disclose any information regarding the substance of the Mediation Process to any party to the C-125 case, whether or not such party is also a Party to the Mediation Process. Except as provided in Paragraph 8.3.1 of the [MPA], all information that is confidential within the Mediation Process and under the [MPA] shall not be admissible for any purpose in the C-125 case or in any judicial or administrative proceeding for any purpose, including but not limited to impeachment.

(Doc. #566, Attach 1.)

Paragraph 8 of the MPA discusses the confidentiality provisions of the mediation process. (Doc. #566, Attach 2.) There are several notable exceptions, such as disclosures to decision-makers and governing bodies (section 8.3.3), disclosure to constituents (section 8.3.4), communications with elected officials (section 8.3.5), and a general catch-all provision (section 8.3.6).

The mediation process only involves certain parties, including WRID. Individual stakeholders, like the Landolts, are not invited to participate. However, the interests and input of individual stakeholders are not completely disregarded in this process. If the mediating parties negotiate a

---

[2] Rule 408 states that:

> Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

[3] California Evidence Code § 1115(a) defines "mediation" as a "process in which a neutral person . . . facilitates communication between the disputants to assist them in reaching a mutually acceptable agreement."

4

settlement agreement it can only become final and effective when all parties to this suit and the court give their approval. (Doc. #566, Attach 2 (section 9.1).)

## LEGAL STANDARD

Attorney disqualification is a matter of state law. *In re County of Los Angeles*, 223 F.3d 990, 995 (9th Cir. 2000). The burden of proof is on the moving party to present sufficient facts justifying disqualification. *Colyer v. Smith*, 50 F. Supp. 2d 966, 967 (C.D. Cal. 1999); *Weeks v. Samsung Heavy Indus. Co.*, 909 F. Supp. 582, 583 (N.D. Ill. 1996); *see also Frazier v. Superior Court*, 97 Cal. App. 4th 23, 36 (2002) ("the courts should start off with the presumption that . . . lawyers will behave in an ethical manner"). Thus, "[a] motion to disqualify should be accompanied by declarations and admissible evidence sufficient to establish the factual predicate upon which the motion depends." *Colyer*, 50 F. Supp. 2d at 967.

Disqualification is a "drastic measure which courts should hesitate to impose except when absolutely necessary[,]" *Freeman v. Chicago Musical Instrument Co.*, 689 F.2d 715, 721-22 (7th Cir. 1982), because it takes away one party's ability to chose his own representation, and it is often a tactic used to create delay or harassment, *Miller v. Alagna*, 138 F. Supp. 2d 1252, 1258-59 (C.D. Cal. 2000). Motions to disqualify are therefore subject to strict judicial scrutiny, *Optyl Eyewear Fashion Intern. Corp. v. Style Companies, Ltd.*, 760 F.2d 1045, 1050 (9th Cir. 1985), and courts have wide discretion in their rulings to further the interests of fairness to all parties, *Int'l Bus. Mach. Corp. v. Levin*, 579 F.2d 271, 279 (3d Cir. 1978).

The rule for concurrent client conflicts is set forth in Nevada Supreme Court Rule 157 (hereinafter "NSCR").[4] NSCR 157, which closely mirrors ABA Model Rule of Professional Conduct 1.7, *Duval Ranching Co. v. Glickman*, 930 F. Supp. 469, 472 (D. Nev. 1996), states:

> 1. A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:
> (a) The lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and

---

[4]The ABA Model Rules' preamble and comments were not adopted, but may be used as guidance to construe the Nevada Rules of Professional Conduct. Nev. Sup. Ct. R. 150.

>(b) Each client consents, preferably in writing, after consultation.
>2. A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:
>(a) The lawyer reasonably believes the representation will not be adversely affected; and
>(b) The client consents, preferably in writing, after consultation.
>When consultation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

Nev. Sup. Ct. R. 157.

## DISCUSSION

As a general rule, only former and current clients have standing to bring a motion to disqualify counsel on the basis of a conflict of interest. *In re Yarn Processing Patent Validity Litig.*, 530 F.2d 83, 88 (5th Cir. 1976); *Colyer v. Smith*, 50 F. Supp. 2d 966, 971 (C.D. Cal. 1999). In the absence of an attorney-client relationship the "powerful presumptions" designed to protect current or former clients and encourage public confidence in the legal profession are inappropriate. *In re Yarn*, 530 F.2d at 89-90. Thus, the threshold issue presented in the Motion to Disqualify is whether the Landolts have standing to seek the disqualification of Mr. DePaoli under federal law, *Colyer*, 50 F. Supp. 2d at 968 n.2, and the burden rests upon the Landolts to prove standing exists, *id.* at 968.

The current standard applied to non client motions to disqualify articulated in *Colyer v. Smith* requires a non client to show they have a "personal stake in the motion," *id.* at 971, because of an "ethical breach [that] so infects the litigation . . . that it impacts the moving party's interest in a just and lawful determination of her claims . . . ." *Id.* This is a two-step inquiry, and the alleged injury to the non client movant must be "(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id.* at 973 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). This standard assures that non clients will not abuse the state rules of professional responsibility by using them as tactical measures to harass the opposition or cause delay. *Id.*; *see Optyl Eyewear Fashion Intern. Corp. v. Style Companies, Ltd.*, 760 F.2d 1045, 1050 (9th Cir. 1985) ("The cost and inconvenience to clients and the judicial system from misuse of the rules for tactical purposes is significant").

6

1. Ethical Breach

The Landolts' position is that an ethical breach has occurred by virtue of Mr. DePaoli's multiple representation in this matter. (Docs. #795, 835.) According to the Landolts, Mr. DePaoli has necessarily breached his duties of loyalty, *see* NSCR 157, and communication, *see* NSCR 154, to his individual stakeholder clients by keeping information from the court ordered mediation confidential. (Doc. #835.) The Landolts contend that all individual stakeholder clients, including themselves, have a real and substantial interest in the details of the mediation because of the potential consequences it would have on their water rights. (*Id.*) Alternatively, the Landolts allege that if Mr. DePaoli has kept his individual clients informed and shared information with them, then he has necessarily violated his duty of confidentiality to WRID, *see* NSCR 156, and is in violation of the court's order and the MPA. (*Id.*)

Although there is some sense in the Landolts' argument, the court cannot find that an ethical violation has occurred. There is no evidence that Mr. DePaoli has even obtained information that would cause a conflict amongst his clients under NSCR 154 and 157, and there is no evidence that WRID and Mr. DePaoli's individual clients have adverse interests. *Colyer*, 50 F. Supp. 2d at 967; *accord In re Discipline of Schaefer*, 25 P.3d 191, 204 (Nev. 2001); *see, e.g.*, *United States v. Linton*, 502 F. Supp. 871, 877 (D. Nev. 1980). All the Landolts have to offer are their own assumptions and speculations. However, the court is unwilling to presume Mr. DePaoli has acted improperly based on bald allegations.

Courts "must assume that an attorney will observe his responsibilities to the legal system, as well as to his client[,]" *Geders v. United States*, 425 U.S. 80, 93 (1976) (Marshall, J., concurring), unless there is evidence to the contrary, *In re Discipline of Schaefer*, 25 P.3d at 204; *Colyer*, 50 F. Supp. 2d at 967. To that extent, the only evidence the Landolts submitted in support of their motion is a list of Mr. DePaoli's clientele (Doc. #796), and the MPA's confidentiality clause. The list itself, however, is inadequate because it does not establish that Mr. DePaoli has information that would cause an ethical violation. *See* NSCR 154, 157. A bare list of names does not necessarily prove that Mr. DePaoli has divided interests. *See* NSCR 157. Nothing about the mediation proceedings can be inferred from the

1  list. *See In re Discipline of Schaefer*, 25 P.3d at 204 (requiring that ethical violations be proven by clear
2  and convincing evidence with "tangible facts").

3  Likewise, neither does the mere existence of a confidentiality clause governing the mediation
4  proceedings establish that Mr. DePaoli has information that would put him in a position of conflict.
5  The court acknowledges that there are many sound reasons for keeping certain matters confidential
6  that have little or nothing to do with the sharing of secret and harmful information. In a case of this
7  size and nature, a confidentiality clause may exist for case management purposes—in the simplification
8  of issues and saving of judicial resources—or to encourage negotiations.[5] Also, it may be important
9  to keep discussions confidential so that information is not inaccurately publicized by the media.

10  Altogether, the court finds there is no real evidence, direct or circumstantial, to support this
11  motion to disqualify. (*See, e.g.*, Doc. #795 at pp. 7-9; Doc. #835 at pp. 12-15.) The Landolts cannot
12  prove Mr. DePaoli has breached his ethical duties by merely pointing to his list of clients, or the MPA's
13  confidentiality provision. Allowing the Landolts to "make [their position more] concrete by
14  speculating" further (Doc. #835 at p. 11) would be illogical.[6] Furthermore, the court will not allow

---

[5] In *Lake Utopia Paper Ltd. v. Connelly Containers, Inc.*, 608 F.2d 928, 930 (2d Cir. 1979), the Second Circuit discussed the value of confidential settlement discussions, stating that:

> [C]onfidentiality permits and encourages counsel to discuss matters in an uninhibited fashion often leading to "settlement, [and] the simplification of the issues . . . ." [Without it,] . . . counsel of necessity will feel constrained to conduct themselves in a cautious, tight-lipped, non-committal manner more suitable to poke players in a high-stakes game than to adversaries attempting to arrive at a just resolution of a civil dispute.

[6] The Landolts attempt to justify their use of a speculative analysis by comparison to Judge Edward C. Reed, Jr. in *Duval Ranching Co. v. Glickman*, 930 F. Supp. 469 (D. Nev. 1996). (Doc. #835 at p. 11.) This gross mischaracterization of Judge Reed's opinion is unconvincing. Judge Reed did not speculate in reaching his conclusion, which by the way, found that disqualification was not required under the circumstances. *Duval Ranching*, 930 F. Supp. at 473. What the Landolts call Judge Reed's analytical "speculations" are in fact only his recitations of the law taken from the ABA Model Rule comments. *Id.* (citing ABA Model Rule 1.7 Official Comment).

In *Duval*, Judge Reed acknowledged the "reasonable likelihood that, at some point in the course of this litigation, the needs of desires of the County Commissioners may diverge from those of the private plaintiffs," but

8

the Landolts to completely avoid their burden of proof by arguing that because the mediation proceedings are confidential they cannot articulate what information has been obtained by Mr. DePaoli. (Doc. #835.)

### 2. The Impact on the Landolts

Non client standing to move to the disqualification of an attorney exists only if there is an "ethical breach [that] so infects the litigation . . . that it impacts the moving party's interest in a just and lawful determination of her claims . . . ." *Colyer*, 50 F. Supp. 2d at 971. The Landolts have not been able to prove Mr. DePaoli has committed an ethical violation, *see id.* at 967; *In re Discipline of Schaefer*, 25 P.3d at 204; however, even if the court were to assume the Landolts had some evidence of a breach, they would still lack standing because they cannot show how it would affect the just determination of their claims.

For instance, the Landolts argue the threat to them may occur if the court were to:

> Suppose the mediating parties learn that a settlement is imminent and that it will mean a loss of some of their existing water rights. . . . Armed with such inside information, the mediating parties could sell off their water rights before [their] decline [in value]. Further, without disclosing the confidential information, Mr. DePaoli could alert his non-mediating clients to sell off water rights before they take a tumble in the marketplace. . . . One can speculate like this *ad infinitem* to illustrate the potential inequity presented . . . .

(Doc. #835 at pp. 11-12.) However, the threat of injury to the Landolts as non clients must be concrete and particularized, and actual or imminent. *Colyer*, 50 F. Supp. 2d at 973 (citing *Lujan*, 504 U.S. at 560). In this case, there is no evidence that any of Mr. DePaoli's clients have recently sold their water rights based on confidential information from the mediation proceedings. There is no evidence of the increasing or declining value of Walker River water rights. The court cannot presume the Landolts suffer from an actual or imminent harm based on "'a chain of speculative contingencies . . . .'" *Eggar v. City of Livingston*, 40 F.3d 312, 316 (9th Cir. 1994) (quoting *Nelsen v. King County*, 895

---

did not speculate further. *Id.* Rather, considering the lack of evidence of an actual conflict at that moment, Judge Reed stopped at "advis[ing]" the district attorney to use "great vigilance" in providing his private clients with independent representation. *Id.*

9

F.2d 1248, 1252 (9th Cir. 1990)). Their concerns are purely hypothetical, not concrete. *Colyer*, 50 F. Supp. 2d at 973.

Next, the Landolts argue that their interests are at risk because Mr. DePaoli's clients may discover and use certain defenses that they and other non-DePaoli clients will not know about because of his participation in the confidential mediation proceedings. (Docs. #795, 835.) To that extent, the Landolts seem to misunderstand the structure of the mediation process, (*e.g.,* Doc. #835 at pp. 12-13; *but see* Doc. #824 at pp. 4-5; *see, e.g.*, Doc. #824, Exhs. A, B), and that this is a "phased" case. That is, this case is so large and complex the court bifurcated the larger and preliminary issues involving the Paiute Tribe claims from the rest of the case in 2000. (Doc. #108.) The mediation procedures were designed to organize, simplify, and possibly settle many of the Pauite Tribe claims. (*See* Doc. #10;l *see also* Doc. #566, Attachs. 1, 2.) Although individual stakeholders were not included in the mediation procedures,[7] for case management purposes, no settlement will actually become "final and effective [until]: (1) it has been executed by *all of the Parties* or their designated representatives; and (2) the

---

[7] It should be noted, however, that the MPA and the mediating parties expressly recognized "the need to keep decision-makers, governing boards, constituents, elected officials and the public in general informed . . . ." (Doc. #566, Attach. 2 (section 8.1).) The confidentiality provisions are therefore not without exceptions. Of course, the Landolts argue that they "are not exceptions at all[,] but an accurate statement of the law which is that anything that is already known cannot be made confidential by a confidentiality agreement." (Doc. #835 at p. 5.) This is simply not true. Section 8.3.1 of the MPA discusses that exact proposition, but section 8.3.3 and its subsections discuss other types of disclosures that would keep interested parties meaningfully informed. (*See* Doc. #566, Attach 2.)

The Landolts also contend that the provision allowing for certain disclosures to constituents is "so narrow that nothing of substance can be disclosed under their terms." (Doc. #835 at p. 5.) Granted, the MPA does not authorize the Landolts to receive a play-by-play of the mediation (*id.* at p. 4), but their characterization of section 8.3.4 of the MPA is simply incorrect. They, along with the rest of WRID's members, may be informed of the "solutions being considered or not considered, including proposals for the allocation of water between Nevada and California; work assignments; and the date or dates of the next negotiating session." (Doc. #566, Attach 2 (section 8.3.4).) This is no small deal. It is not readily apparent to the court, nor has it been explained by the Landolts, why it would be necessary for them to know more, such as "who said what," and "how these solutions were negotiated between the parties."

10

District Court has approved [it] . . . ." (Doc. #566, Attach 2 (section 9.1) (emphasis added).) The Landolts cannot claim there is an actual or imminent danger to the just determination of their claims given those preconditions to settlement. The fact that settlement discussions have not even concluded also goes against the Landolts, because the role of individual stakeholders has not yet come into play.

Furthermore, the Landolts' fear of being at a tactical disadvantage completely ignores the court's order, which stated:

> As soon as [it is] convenient, . . . the Magistrate Judge shall consider and make a preliminary determination of the threshold issues to be addressed at the *outset* of the litigation on the U.S./Tribe [claims]. . . . The list . . . will not be finally resolved and settled by the Magistrate Judge until *all* appropriate parties are joined.

(Doc. #108 (emphasis added).) The list will be compiled through the joint efforts of all parties to this case, including Mr. DePaoli's clients. (*Id.*) Thus, since everyone will know what defenses are available, for example, and that "many of the defenses to the claims of the U.S./Tribe claims . . . may be the same or similar[,]" (*id.*) the court fails to see how the Landolts' alleged injury is concrete or particularized, *Colyer*, 50 F. Supp. 2d at 973.

Based on the overwhelming lack of evidence, the Motion for Disqualification must be denied. There is no proof that Mr. DePaoli has committed an ethical violation, and the Landolts have not provided the court with any legal principle that would justify a presumption otherwise. *See United States v. Linton*, 502 F. Supp. at 877 ("[A] trial court must be able to rely upon the good faith and judgment of counsel, for they are in the best position to know when a conflict exists or probably will develop"); *see, e.g.*, *Duval Ranching Co.*, 930 F. Supp. at 473 (refusing to disqualify an attorney even when there was a "reasonable likelihood that, at some point in the course of [the] litigation, the needs or desires of County Commissioners may diverge from those of the private plaintiffs"). However, even if the court were to assume a conflict existed, the Landolts cannot sufficiently articulate how the just determination of their claims is actually at risk. *Colyer*, 50 F. Supp. 2d at 973. Every alleged potential situation depended on multiple assumptions (*e.g.*, Doc. #835 at pp. 11-12), and failed to consider the court's bifurcation of this litigation and the mediation proceedings.

The court emphasizes, however, that this case is a phased litigation. (Doc. #108.) The mediation proceedings are only the introduction towards the identification of the issues in "Phase I" that their final resolution in "Phase II." (Doc. #108.) The Landolts' objections are premature now, but may be appropriate in the future. *See, e.g.*, *United States v. Linton*, 502 F. Supp. at 877.

Accordingly, the court finds that at this time the Landolts have failed to establish either prong of the *Colyer* standard and, therefore, have failed to establish standing to bring this Motion.

## ORDER

**IT IS HEREBY ORDERED** that the Landolts' Motion to Disqualify Gordon DePaoli (Doc. #795) is **DENIED**.

DATED: March 10, 2006.

_____
UNITED STATES MAGISTRATE JUDGE

12