1

2

3

4                          **UNITED STATES DISTRICT COURT**

5                                  **DISTRICT OF NEVADA**

6

UNITED STATES OF AMERICA et al.,           )
7                                           )
              Plaintiffs,                   )
8                                           )        3:73-cv-00127-RCJ-WGC
          vs.                               )
9                                           )        In Equity No. C-125-B
WALKER RIVER IRRIGATION DISTRICT et        )
10  al.,                                    )                 **ORDER**
                                            )
11            Defendants.                   )
                                            )
12  ─────────────────────────────────      )

13        This is Sub-file B of a ninety-one year old case concerning the adjudication and

14  continuing supervision of water rights in the Walker River Basin.  There are three "sub-files" in

15  the case, each with their own administrative existence, in which various parties have asked for

16  further amendments to the Decree governing the waters.  Pending before the Court are two

17  motions to dismiss and a joinder to the latter motion.  For the reasons given herein, the Court

18  denies the first motion and grants the second motion in part.

    **I.    FACTS AND PROCEDURAL HISTORY[1]**

19      **A.    Facts**

20        The Walker River Basin covers approximately 4050 square miles.  The basin stretches in

21  a northeasterly direction from its origins in the southwestern elevations of the Sierra Nevada

22  Mountains to the basin's terminus, Walker Lake.  Between the headwaters of the Walker River in

23

24  ─────────────────

        [1]The Court has taken much of the background information herein from *Mineral County v.*
25  *Nevada ex rel. Department of Conservation and Natural Resources*, 20 P.3d 800 (Nev. 2001).

1  Mono County, California, and its terminus at Walker Lake in Mineral County, Nevada, the

2  Walker River Basin includes portions of Nevada's Douglas, Lyon, and Churchill Counties.

3  Approximately 25% of the Walker River Basin lies within California, and this portion of the

4  basin accounts for the majority of the precipitation feeding the system and is the primary source

5  of the basin's surface water flows.  On the other hand, the vast majority of consumptive water

6  use within the basin and loss through evaporation from surface waters takes place in Nevada.

7  The basin's principal agricultural water use occurs in the Bridgeport and Antelope Valleys in

8  Mono County, California and in the Smith and Mason Valleys in Lyon County, Nevada.

9       The Walker River system consists of two forks, the West Walker River and the East

10  Walker River.  The West Walker River has its origins below the divide that separates the Walker

11  River Basin from Yosemite National Park.  From its origin, the West Walker River flows north

12  through Leavitt Meadow and into Antelope Valley.  Before reaching Nevada, water from the

13  West Walker River is partially diverted into Topaz Reservoir for storage.[2]  The East Walker

14  River is fed by waters in the high Sierras north of Mono Lake.  Water draining from Virginia

15  Lakes flows north and joins with water from Green, Robinson, Summers, and Buckeye Creeks.

16  These flows are impounded at Bridgeport Reservoir.[3]  The two forks meet approximately seven

17  miles upstream from Yerington, Nevada at the south end of Mason Valley.  The river flows

18  further north before turning south, entering the Walker River Paiute Indian Reservation (the

19

20

21

22  [2]Topaz Reservoir, which straddles the California–Nevada border, was constructed in 1922 by the Walker River Irrigation District ("WRID"), which was organized by irrigation users in the Smith and Mason Valleys in 1919 and which provides surface and storage water rights for

23  approximately 80,000 acres of agricultural land located primarily in the Smith and Mason Valleys in Lyon County, Nevada.

24

25  [3]WRID constructed Bridgeport Reservoir in 1923 to provide storage for downstream users.

1    "Reservation"), flowing through Campbell Valley, and entering Weber Reservoir.[4]  From Weber

2    Reservoir, it continues south for approximately twenty-one miles before entering Walker Lake.

3         Walker Lake is a remnant of the Pleistocene Lake Lahontan that covered much of

4    northern Nevada.  As the climate dried, Lake Lahontan receded and many closed valleys became

5    isolated dry lakebeds.  However, several major rivers draining from the eastern slopes of the

6    Sierras continued to support lakes and wetlands in some of these closed valleys, including

7    present day Walker Lake. *See* D.K. Grayson, *The Desert's Past: A Natural Prehistory of the*

8    *Great Basin* (Smithsonian Institution Press, 1993).  Walker Lake is a "terminal lake," meaning

9    there is no outflow from the lake and all surface runoff terminates in the lake.  Walker Lake is

10    approximately thirteen miles long, just over five miles wide, approximately ninety feet deep, and

11    contains approximately two million acre-feet[5] of water.  The shores of Walker Lake are almost

12    entirely devoid of major plant growth, due in part to the extreme fluctuations in water level.  The

13    waters of Walker Lake are characterized by high concentrations of total dissolved solids ("TDS")

14    consisting mainly of salts, high temperatures, low dissolved oxygen, and the presence of

15    hydrogen sulfide.  The lake also tends to support large blooms of planktonic blue-green algae,

16    which, when combined with the high TDS concentrations and low dissolved oxygen, create an

17    inhospitable environment for fish.

18         The cause of Walker Lake's low water level is disputed.  Due to the highly variable

19    hydrology of the Walker River Basin, Walker River has rarely produced "average" inflows to

20    Walker Lake.  It is clear, however, that Walker Lake currently has less water than it had when

21

---

22      [4]Weber Reservoir was constructed on the Reservation by the United States for the benefit
of the Walker River Paiute Indian Tribe (the "Tribe").  This is the only reservoir on the main
23    stem of the Walker River.

24      [5]An acre-foot is an agricultural unit of measurement equal to a volume of water with an
area of one acre and a depth of one foot.  A square covering an acre of area is just under seventy
25    yards on a side.  An acre-foot of volume is just under one-third of a million gallons.

1    initial recordings were taken in 1882.  As of March 1996, Walker Lake had only 50% of its 1882

2    surface area and 28% of its 1882 volume.  The situation has declined since then.  The ultimate

3    cause of the decline is potentially attributable to a number of factors, including, but not limited

4    to, overconsumption, declining precipitation levels, and natural lake recession over time.  In

5    November 1994, Public Resource Associates, a public interest group concerned with the

6    protection of Walker Lake, prepared a report describing the status of the lake and its wildlife.

7    The report indicated that Walker Lake supports a fragile balance of algae, zooplankton, small

8    crustaceans, insects, and three endemic fish species: the tui chub, Lahontan cutthroat trout, and

9    Tahoe sucker.  Walker Lake is also an important habitat for a wide variety of migratory birds.

10              **B.        Procedural History**

11            The Walker River and its tributaries in the Walker River Basin have been the object of

12   litigation for over a century.  In 1902, Miller & Lux, a cattle and land company, brought an action

13   in this Court against Thomas Rickey and others to enjoin interference with Miller & Lux's use of

14   the Walker River, and in October 1904, Rickey Land & Cattle Co. began two actions in a

15   California state court against Miller & Lux to establish its prior right to waters on the East and

16   West Walker Rivers. *See Rickey Land & Cattle Co. v. Miller & Lux*, 218 U.S. 258 (1910)

17   (Holmes, J.); *Miller & Lux v. Rickey*, 146 F. 574 (C.C.D. Nev. 1906) (Hawley, J.); *Miller & Lux*

18   *v. Rickey*, 127 F. 573 (C.C.D. Nev. 1904) (Hawley, J.).  In 1906, Miller & Lux and other

19   defendants sought to enjoin the proceedings in the California actions on the grounds that this

20   Court had acquired prior exclusive jurisdiction.  The Supreme Court agreed, and enjoined the

21   California actions. *See Rickey Land & Cattle Co.*, 218 U.S. 258.  The Court entered a final decree

22   in 1919. *See Pac. Livestock Co. v. Thomas Rickey*, In Equity No. 731, Final Decree (D. Nev.

23   1919).

24            In 1924, the United States brought an action, In Equity No. C-125, in this Court seeking

25   to establish water rights for the Reservation and to settle all surface water rights on the Walker

1    River system.  This litigation resulted in the 1936 Decree by Judge St. Sure, and in 1940 the

2    Decree was amended to conform to the Court of Appeals's ruling that the Department of the

3    Interior's creation of the Reservation in 1859 impliedly reserved waters for the Tribe despite the

4    lack of any treaty making an express reservation.  The Decree formalized the ownership of

5    surface water rights from the Walker River that had been acquired pursuant to Nevada's common

6    law doctrine of prior appropriation.  It did not explicitly address groundwater rights.  The Decree

7    created the Walker River Commission and the United States Board of Water Commissioners (the

8    "Board"), members of which were appointed by the Court to administer the Decree.

9          In September 1987, the Tribe sought to intervene in the C-125 Case to establish rules and

10   regulations concerning applications to change the allocation of water rights subject to the Decree.

11   Judge Reed granted the motion to intervene on March 2, 1988; as a result, the Nevada State

12   Engineer is now required to review change applications, subject to this Court's approval pursuant

13   to its continuing jurisdiction over the waters of the Walker River Basin.

14         In 1991, the California State Water Resources Control Board ("CSWRCB") issued

15   restrictions on water licenses held by WRID, requiring it to maintain minimum flows and pools

16   in its reservoirs.  As a result of the decision by CSWRCB, WRID filed a petition for declaratory

17   and injunctive relief in the C-125 Case.  Judge Reed designated the motion as "Sub-file

18   C-125-A" of the C-125 Case, and it was assigned case number 3:73-cv-126.  The Tribe served an

19   answer, counterclaim, and cross-claim.  In 1992, the United States filed a motion for leave to file

20   a counterclaim, which Judge Reed permitted and designated as "Sub-file C-125-B" of the C-125

21   case, and which was assigned case number 3:73-cv-127.  That is the present case, in which the

22   United States and the Tribe seek additional rights under federal law beyond those previously

23   adjudicated in the Decree.

24         On October 25, 1994, Mineral County filed a motion to intervene in the C-125 Case.

25   Judge Reed designated the motion as "Sub-file C-125-C" of the C-125 Case, and it was assigned

1    case number 3:73-cv-128.  Mineral County argues that because Walker Lake is held in trust

2    pursuant to Nevada's public trust doctrine, the Decree should be amended to readjust the priority

3    of appropriation of waters in the Walker River Basin that feed Walker Lake.  In its prayer for

4    relief, Mineral County asks that the Court modify the Decree by: (1) recognizing the rights of

5    Mineral County to have minimum levels in Walker Lake; (2) ordering the State of Nevada to

6    grant a certificate to Mineral County for the benefit of Walker Lake; and (3) recognizing that

7    minimum flows are necessary to maintain Walker Lake as a "beneficial use and in the public

8    interest and required under the doctrine of maintenance of the public trust."

9         **C.      The Present Motions**

10        The First Amended Counterclaims ("FACC") forming the basis of Sub-file B were filed

11   by the United States on behalf of itself and the Tribe on July 31, 1997. (*See* ECF No. 59).  There

12   are eleven claims in the United States' FACC.  First, the United States appears to claim—the

13   nature of the claim is not entirely clear—that due to the ability to store water in Weber Reservoir,

14   the Tribe should have the right to use enough water to irrigate more land than the 2100 acres

15   upon which its decreed right to a flow of 26.25 cfs is based.  Second, the United States argues

16   that the Tribe is entitled to enough water to irrigate lands added to the Reservation on September

17   25, 1936.  Third, the United States claims the right to use groundwater in the basin as necessary

18   to fulfill the rights claimed under the Decree, or in addition to the Decree as necessary to irrigate

19   the additional lands added to the Reservation in 1936.  Fourth, the United States claims reserved

20   water for the Yerington Paiute Tribe.  Fifth, the United States claims reserved water for the

21   Bridgeport Paiute Indian Colony.  Sixth and seventh, the United States claims reserved water for

22   the Garrison and Cluette (Indian) Allotments and for various individual (Indian) allotments.

23   Eighth, the United States claims reserved water for the Hawthorne Army Ammunition Plant.

24   Ninth, the United States claims reserved water for the Toiyabe National Forest.  Tenth, the

25   United States claims reserved water for the U.S. Marine Corps Mountain Warfare Training

1    Center.  Eleventh, the United States claims reserved water for the Bureau of Land Management.

2           The Tribe's separate FACC, also filed on July 31, 1997, contains three claims. (*See* ECF

3    No. 58).  First, the Tribe claims the right to store water in Weber Reservoir for any legitimate

4    purpose under federal law, with a priority date of April 15, 1936.  The Tribe does not claim a

5    right to any particular amount of storage.  Second, the Tribe claims a right to use water from the

6    Walker River on the lands added to the Reservation in 1936 for any legitimate purpose under

7    federal law.  The Tribe does not claim a right to any particular amount of water.  Third, the Tribe

8    claims the right to use groundwater under and adjacent to the Reservation, including the portion

9    of the Reservation added in 1936, for any legitimate purpose under federal law, with a priority

10   date of November 29, 1859.

11          Under a Case Management Order entered by Judge Reed on April 18, 2000, (*see* ECF No.

12   108), the claims concerning the Tribe's rights (the Tribe's three claims and the United States'

13   first three claims, collectively the "Tribal Claims") are to proceed first, the remaining federal

14   claims to the water (the claims as to other Indian entities and federal agencies and departments,

15   collectively the "Federal Claims") are stayed, and after completion of service of process upon the

16   many users of water in the Walker River Basin, certain threshold issues, such as the present

17   jurisdictional issues, are to be decided before addressing the Tribal Claims on the merits.  A

18   supplemental Case Management Order requires threshold issues to be addressed under Rule

19   12(b) and directs such motions to address both the Tribal Claims and the Federal Claims.

20   (*See* ECF No. 1865).  Service of process has been completed.  The Nevada Department of

21   Wildlife ("NDOW") and WRID have separately moved to dismiss based on threshold

22   jurisdictional issues.

23   ///

24   ///

25   ///

1   **II.     DISCUSSION**

2          **A.       Nevada Department of Wildlife's ("NDOW") Motion**

3          NDOW asks the Court to dismiss insofar as the FACC seeks injunctions against

4   groundwater users outside of the reservation.  NDOW appears to admit that the Court has

5   jurisdiction over groundwater insofar as groundwater pumping interferes with decreed rights.

6   NDOW, however, asks the Court to dismiss the United States' prayer for injunctive relief against

7   groundwater users, because the issues of whether groundwater pumping affects decreed rights

8   and whether the United States is entitled to increased water under the Decree should be

9   determined in separate actions.

10          The Court does not perceive any particular claim by the United States or the Tribe to

11   enjoin any particular groundwater pumping.  Both parties have included *pro forma* prayers for

12   the Court to enjoin any activity inconsistent with their claimed rights, but a party would have to

13   file a much more particularized motion against particular activity to obtain such an injunction.

14   Even assuming a particularized motion for an injunction had been filed, the administration of

15   such a motion would not depend on whether a separate action had been brought.  This Court

16   would preside over any separate action to enjoin groundwater pumping based on interference

17   with decreed rights, and creating another sub-file would only complicate the matter

18   administratively.  The Court is capable of addressing motions for modifications to the Decree in

19   the same action as motions for injunctive relief.  The Court would address any motion for

20   injunctive relief alleging that groundwater pumping adversely affected the complaining user's

21   decreed rights based on the then-existing rights of the complaining user.  Whether to defer a

22   ruling on such a motion until any pending motions concerning the extent of the complainant's

23   rights had been adjudicated is not a particularly complex procedural issue.  The Court routinely

24   makes those kinds of case management decisions.  The Court denies the motion.

25   ///

1      **B.      Walker River Irrigation District's ("WRID") Motion**

2      **1.      Jurisdiction Under the Decree and Claim Preclusion**

3      WRID first argues that the Court has no jurisdiction to adjudicate additional claims to

4      water because the Court only retained jurisdiction to change the duty or water, to correct or

5      modify the Decree, or to regulate the use of water, e.g., by changing the place of use:

6              The Court retains jurisdiction of this cause for the purpose of changing the
       duty of water or for correcting or modifying this decree; also for regulatory purposes,
7      including a change of the place of use of any water user, but no water shall be sold
       or delivered outside of the basin of the Walker River except that appurtenant to the
8      lands of Mrs. J.A. Conway and R.P. Conway . . . .

9      Decree at 74–75.  But the Court did not, WRID argues, retain jurisdiction to grant additional

10     rights.  The Court disagrees that the Decree is clear on this point, and to the extent it is clear, it is

11     clear in favor of the Tribe's and the United States' reading of "modify" to permit the adjudication

12     of yet-unlitigated rights.  Continued jurisdiction to "modify" the Decree implies an ability to

13     increase or decrease one's rights thereunder.  The phrase "correcting or modifying this decree"

14     implies that modifications are to be distinguished from corrections, i.e., that changes to the

15     Decree may be based on yet-unlitigated claims in addition to claims that were decided incorrectly

16     or which suffer from scrivener's errors.  Presumably, a "modification" of the Decree, like a

17     modification of a contract, could either increase or decrease one's rights thereunder.  In other

18     words, "correcting" the Decree implies entertaining Rule 60(a)-type motions, and "modifying"

19     the Decree implies entertaining Rule 60(b)-type motions.  The Court expressly retained

20     jurisdiction to do either, although the present Civil Rules so enumerating these concepts were not

21     adopted until a year after the Decree was first entered with the relevant language.[6]

22             WRID analogizes the present counterclaims to a situation where a party seeks to reopen a

23

24             [6]Civil Rules 60(a) and 60(b) were modeled after, *inter alia*, previous Equity Rule 72 and
       California Code of Civil Procedure § 473 (1937), respectively. *See* Fed. R. Civ. P. 60 advisory
25     committee's notes.

closed action in order to bring what amounts to a new action or supplementation of an adjudicated complaint.  But the Court has jurisdiction to consider the present claims under either interpretation.  If the present Sub-file is part of the C-125 case, i.e., not a new action, the Court can potentially modify the Decree under the standards of Rule 60(b).[7]  If the present Sub-file is in substance a new action,[8] the Court may adjudicate the claims, subject to preclusion principles, laches, etc.  In either case, laches probably prevents any claim inconsistent with the 1936 Decree, unless a claimant could show that extraordinary circumstances beyond his control prevented him from bringing his claims until the 1990s, a highly unlikely circumstance. *See United States v. Alpine Land & Reservoir Co.*, 984 F.2d 1047, 1049 (9th Cir. 1993) (reversing as an abuse of discretion Judge Thompson's grant of a 1991 Rule 60(b)(6) motion to modify the 1980 Alpine Land Decree) ("Rule 60(b)(6) has been used sparingly as an equitable remedy to prevent manifest injustice.  The rule is to be utilized only where extraordinary circumstances prevented a party from taking timely action to prevent or correct an erroneous judgment. . . . [T]here is no reason for holding litigants in complex water rights litigation to any lesser standard than litigants in

---

[7]That is not to say that any given claim can succeed.  Under Rule 60(c)(1), the only subsections of Rule 60(b) available at all as to the Decree are Rules 60(b)(4)–(6).  Rules 60(b)(4) and 60(b)(5) would seem to have no application here, and Rule 60(b)(6)—the only subsection of the rule plausibly available in the present context—is an equitable rule, and laches will bar any claim where the claimant has slept on his rights.

[8]The United States and the Tribe can also reasonably be viewed as having in substance filed a new case.  Judge Reed gave this case its own administrative existence many years ago.  The fact that the present case has been called a "Sub-file" of the original case and the claims made herein called "counterclaims" is not critical.  The claims are called "counterclaims" because they originated in the C-125 case before Judge Reed ordered them assigned to a new, separate case.  Service of process has been independently (and painstakingly) accomplished as to the FACCs in its own right.  Any modification to the Decree based on the FACCs in this case therefore need not even be viewed as a modification of the existing Decree without jurisdiction—as noted, *supra*, modification of the Decree to add new rights is not clearly improper, in any case—but could in substance be viewed as a new decree, just as the 1936 Decree was a new decree as to the existing decree from *Pacific Livestock Co. v. Rickey*, In Equity No. 731 (1919).

1   other proceedings.").  The only real difference between the two approaches—and the United

2   States argues that WRID characterizes the present Sub-file as a new action for the purpose of

3   invoking it—is claim preclusion, i.e., *res judicata*.

4        WRID admits that the Court has jurisdiction to entertain new claims to water based on

5   federal law—which is the basis of the United States' and the Tribe's claims— but it argues that a

6   new action must be brought.  On balance, the Court believes the present action is in fact a new

7   action, and that the present claims are therefore precluded.  The Decree prevents the United

8   States (like all parties) from claiming any additional rights beyond those adjudicated therein,

9   whether based on state law or federal law. *See* Decree at 73.  The Sub-files were given their own

10  administrative existences, so they are independent cases at least in form,[9] although their

11  characterization by Judge Reed as "Sub-files" provides a non-frivolous argument that he intended

12  them to be part of the same case in substance.

13       In summary, the Court will dismiss the claims for lack of jurisdiction.  The present case is

14  best characterized as an independent case with jurisdiction supported under 28 U.S.C. §§ 1331

15

16  [9]Judge Reed's order creating the first sub-file, Sub-file A, made clear that a new case was
being opened and that it was being designated as a "sub-file" of the C-125 Case because it was "a
17  related action" as to that case. (*See* Min. Order, Jan. 3, 1992, ECF No. 250 in Case No. 3:73-cv-
125).  At that time, the Court's docket was still purely physical, and Judge Reed ordered that the
18  original copy of the petition be removed from the file of the C-125 case and placed into the
docket of the new case. (*See id.*).  On March 18, 1992, the Tribe filed its Answer to the First
19  Amended Petition, Counterclaims, and Crossclaims ("FAPCC") in the C-125 case.  Judge Reed
then ordered the present case opened as a separate case, originally consisting only of the
20  counterclaims, via Minute Order on May 18, 1992. (*See* Min. Order, May 18, 1992, ECF No. 2).
A copy of the FAPCC, as opposed to the original, was filed in the present case, because there
21  was of course only one original, and part of the FAPCC (the answer and crossclaims) remained
operative in the C-125 case.  The United States later intervened to plead its own "counterclaims,"
22  although that pleading should probably have been titled as a complaint in intervention, seeing as
the pleading had been filed in the present case, and not in the C-125 case.  The Court rejects the
23  United States' argument that the present Sub-file could not possibly be a new case because the
United States has not consented to be sued in a new case.  If characterized as a new case, the
24  United States would be properly characterized as a Plaintiff or a Plaintiff-in-Intervention.  The
United States voluntarily brought the present claims.  Indeed, the present case, C-125-B, 3:73-cv-
25  127, lists the United States as the Plaintiff.

1    and 1362, i.e., based on the Tribe's claim to water rights under federal law.  But the claims are

2    precluded.  The United States and the Tribe litigated their rights to the waters of the Walker

3    River from 1924 to 1940. *See Nevada v. United States (Orr Ditch)*, 463 U.S. 110, 129–45 (1983)

4    (Rehnquist, J.).  Here, the Decree prevents the parties from seeking additional water rights under

5    the Decree, *see* Decree at 73 ("forever enjoined and restrained from claiming any rights in or to

6    the waters of Walker River and/or its branches and/or its tributaries, except the rights set up and

7    specified in this Decree"), just as the Orr Ditch Decree prevented the parties thereto from seeking

8    additional rights in the waters governed by that Decree, *see Nevada*, 463 U.S. at 132 ("*forever*

9    *enjoined and restrained from asserting or claiming any rights in or to the waters of the Truckee*

10   *River or its tributaries, or the waters of any of the creeks or streams or other waters*

11   *hereinbefore mentioned except the rights, specified, determined and allowed by this decree*").

12   The Supreme Court emphasized this text itself.

13        Even if the present Sub-file were not in substance a new action but better characterized as

14   a Rule 60(b)(6) motion in the original action, laches would almost certainly bar the claims. *See*

15   *Alpine Land & Reservoir Co.*, 984 F.2d at 1049.  In summary, the Court has statutory jurisdiction

16   over pre-Decree claims under §§ 1331 and 1362, but those claims are precluded, and even if

17   characterized as a Rule 60(b)(6) motion under the "modify" prong of the continuing jurisdiction

18   clause of the Decree, laches would bar the claims.[10]  Post-Decree claims must be made to the

19   state authorities in the first instance, whether based on state or federal law.

20   ///

21

22   [10]Any pre-Decree claims to water by the United States will almost certainly be barred by
     laches regardless of whether asserted via a Rule 60(b)(6) motion as to the Decree or in a new
     action—it does not appear disputed that the United States owned all the relevant lands for which
23   it now seeks water rights when it brought and litigated the present case from 1924 to 1935 in this
     Court—and any post-Decree state law appropriative claims to water, even if not barred by laches,
24   would be junior to any decreed rights such that modification of the Decree would not be
     appropriate any more than it would be appropriate to modify the Decree to recognize other junior
25   "new lands" rights granted by the State Engineer since the Decree issued.

1          **2.      Groundwater**

2          Finally, the Court finds that it has jurisdiction over groundwater for a single purpose.  The

3    scope of the Decree does not extend to declaring rights to groundwater, but only to surface water.

4    The Decree concerns adjudication of the waters of the "Walker River and/or its tributaries,"

5    which does not include groundwater.  The Court will therefore neither affirm nor deny any

6    party's right to pump groundwater within or without the basin of the Walker River.  However,

7    the Court may adjudicate claims that any person's pumping of groundwater, within or without

8    the basin of the Walker River, adversely affects decreed rights under the no injury rule.  That is

9    the only context under which this Court has jurisdiction under the Decree to say anything about

10   groundwater pumping: it may enjoin groundwater pumping (or any activity) by anyone anywhere

11   that interferes with rights adjudicated under the Decree.

12         The Supreme Court has reached this precise result in an original proceeding. *See Kansas*

13   *v. Nebraska*, 135 S. Ct. 1042 (2015).  In 1943, Congress approved the Republican River

14   Compact ("RRC") entered into by Kansas, Nebraska, and Colorado in order to allocate waters in

15   the Republican River Basin. *Id.* at 1049.  In 1997, Kansas sued Nebraska in the Supreme Court,

16   arguing that Nebraska's pumping of groundwater in areas "hydraulically connected to the

17   Republican River and its tributaries" depleted stream flow in the basin and that the amount of

18   depletion should count against Nebraska's allocation of surface water under the RCC. *Id.* at

19   1049–50.  Nebraska moved to dismiss, arguing that groundwater pumping was outside the scope

20   of the RCC even if it did in fact deplete stream flow. *Id.* at 1050.  The Special Master appointed

21   by the Court agreed with Kansas' interpretation of the RCC, and the Supreme Court summarily

22   approved the proposed ruling and remanded for further findings. *See Kansas v. Nebraska*, 120 S.

23   Ct. 2764, 2764 (2000) (denying Nebraska's motion to dismiss and remanding).

24         The Special Master had found that even if he were not to assume as true the alleged

25   hydraulic connection between groundwater pumping and stream flow in the context of the

1   motion to dismiss, such a connection was a "well established scientific fact," with groundwater

2   entering the stream wherever the surrounding water table was at a higher elevation than the

3   relevant segment of the stream and exiting the stream wherever it was lower. *See* Final Report of

4   the Special Master 2 & n.3, Jan. 28, 2000, *available at* http://www.supremecourt.gov/

5   SpecMastRpt/SpecMastRpt.aspx (citing Thomas C. Winter et al., *Ground Water and Surface*

6   *Water: A Single Resource*, U.S. Geological Survey Circular 1139 (1998); Bureau of Reclamation,

7   U.S. Dept. of the Interior, *Republican River Basin Water Management Study: Colorado,*

8   *Nebraska, Kansas* 41, 43 (1985)).  The Special Master noted that the Supreme Court had

9   recognized the connection between wells and surface water as early as 1907. *See id.* at 24 (citing

10  *Kansas v. Colorado*, 206 U.S. 46, 114–15 (1907)).

11          The RRC defined the "virgin water supply" as "the water supply within the basin

12  undepleted by the activities of man." *Id.* at 12.  The RCC allocated the annual virgin water supply

13  between the contracting states by sub-basin. *Id.* at 12–13.  In 1961, the Republican River

14  Compact Administration ("RRCA") began counting groundwater pumped "from the alluvium

15  along the stream channels" against a state's allocation, equating such pumping to a diversion

16  directly from the stream, i.e., counting 100% of the pumped water against the pumping state's

17  allocation. *Id.* 16.  "Table-land" wells, however, were discounted altogether because of

18  insufficient data and understanding as to how such pumping affected stream flow. *Id.*  Although

19  the RRCA continued to call for more research, it never incorporated "table-land" groundwater

20  pumping into its allocation formulas. *Id.* at 17.  Kansas sued Nebraska, arguing that any pumping

21  that depleted the "virgin water supply" under the RRC should count against a state's allocation of

22  virgin water. *Id.*

23          The Special Master characterized the question before him as: "Does the Compact restrict

24  groundwater pumping that depletes the stream flow in the Republican River Basin?" *Id.* at 18.

25  The Special Master found that the fact that the RCC did not use the word "groundwater" did not

1    matter if groundwater pumping caused a state to receive more of the water governed by the RCC

2    than it was entitled to thereunder. *Id.* at 21–22.[11]  Two previous Supreme Court cases interpreting

3    interstate compacts directly supported this result. *See id.* at 34–36 (citing *Kansas v. Colorado*,

4    514 U.S. 673, at 691–94 (1995); *Texas v. New Mexico*, 482 U.S. 124, 127–28 (1987)).  The

5    Special Master ruled that the RRC unambiguously provided that groundwater pumping, like any

6    activity, was to be counted against a state's allocation of water thereunder to the extent the

7    pumping depleted stream flow in the Basin. *See id.* at 23.  He also noted that the subjective intent

8    of the drafters of the RRC had been to govern groundwater pumping that affected stream flow.

9    *See id.* at 23–31.  The RRCA had also interpreted the RRC to govern groundwater pumping that

10   affected stream flow and had only not yet included "table-well" pumping because its effect on

11   stream flow was so difficult to calculate. *Id.* at 32–34.  The Special Master also noted that no

12   state law as to groundwater could control the interpretation of a federal compact, and there was

13   no conflicting law in any case. *Id.* at 39.

14        Whether the Court has jurisdiction over groundwater pumping in the present case

15

16        [11]This is a commonsense conclusion.  Imagine, for example, that one could devise a way
     to capture the evaporation from a stream in an efficient way.  Depleting the water vapor from the
17   air immediately above the stream would, under ordinary principles of thermodynamics, cause
     more water to evaporate until the water vapor-to-air ratio reached equilibrium at the relevant
18   temperature and pressure.  One would not be heard to argue that the two cubic feet per second of
     water he had taken from the air immediately above the stream in this manner should not count
19   against his five cubic feet per second allocation of water from the stream simply because it had
     passed through the air between the stream and his field.  The user has taken the water in a way
20   that depletes water from the stream.  For the same reason, one who filters his water through the
     soil before using it cannot be heard to argue that this water should not be considered to have
21   come from the stream.  Not only is it untrue that the taking of water in this way does not affect
     the stream in some indirect way, but it is not even true that such water is not taken from the
22   stream itself.  Both the pumper and the evaporation capturer have initially taken water that was
     not in the stream, but only in the surrounding soil and air, respectively, when they began their
23   extractions.  But eventually the water being used by both of them is water that was indeed in the
     stream when they began their respective extractions.  It has flowed from the stream, through the
24   soil or air, respectively, and to the extractor's place of use in a foreseeable, intended, and
     unbroken path.
25

1    depends on the language of the Decree.  That is, just as the Supreme Court in *Kansas v.*

2    *Nebraska* examined the language of the RRC in order to determine its reach, the Court here must

3    examine the language of the Decree.  Via the Decree, the Court adjudicated the rights of the

4    parties to use certain amounts of water from the Walker River, with priority dates. *See* Decree at

5    10–11, Apr. 14, 1936.  The parties were:

6            adjudged to be the owners of the use of the several amounts of water from the several
             streams as above set forth and are entitled to divert and use such waters of Walker
7            River and/or its tributaries as the case may be, for the beneficial purposes specified,
             subject to and in accord with the priorities above set forth.
8
     *Id.* at 72.  The parties to the case and their successors-in-interest were "forever enjoined and
9
     restrained from claiming any rights in or to the waters of Walker River and/or its branches and/or
10
     its tributaries, except the rights set up and specified in this Decree . . . ." *Id.* at 73.  The parties
11
     were also specifically:
12
             enjoined and restrained from taking, diverting or interfering *in any way* with the
13           waters of the said Walker River or its branches or tributaries so as to *in any way or*
             *manner* interfere with the diversion, enjoyment and use of the waters of any of the
14           other parties to this suit as set forth in this decree . . . .

15   *Id.* (emphases added).  This passage plainly gives the Court jurisdiction to enjoin groundwater

16   pumping that interferes with decreed rights.  Whether a complainant can prove interference is

17   another matter, but there is jurisdiction to resolve such a claim.

18          The Decree declares that certain parties have the right to use certain amounts of water and

19   that no other party may divert water in a way that interferes with those rights. *See id.* at 72–73.  A

20   court always has jurisdiction to enforce its orders by holding those in violation of them in

21   contempt. *See, e.g.*, *Davies v. Grossmont Union High Sch. Dist.*, 930 F.2d 1390, 1393 (9th Cir.

22   1991).  It seems clear, therefore, that the Court has jurisdiction to restrain groundwater pumping

23   (or any other activity) by any party to the action (and their successors-in-interest) if the activity

24   "interfere[s] with the diversion, enjoyment and use of the waters of any of the other parties."

25   And although the Decree does not specifically enjoin non-parties from such interference, it is not

1   a close question that the Court may also enjoin non-parties from activity that interferes with the

2   declared rights of the parties.  The general principle recounted in *Davies* permits the Court to use

3   the contempt power to prevent any party from interfering with the rights of the parties as declared

4   by the Court.  In summary, the Court has jurisdiction to enjoin any activity by any person that

5   interferes with the rights declared in the Decree.

6          The scientific scholarship makes it clear that groundwater pumping from an aquifer

7   connected to a stream can affect the flow of that stream. *See generally* Paul M. Barlow & Stanley

8   A. Leake, *Streamflow Depletion by Wells—Understanding and Managing the Effects of*

9   *Groundwater Pumping on Streamflow*, U.S. Geological Survey Circular 1376 (2012), *available*

10  *at* http://pubs.usgs.gov/circ/ 1376/.  The factual connection between groundwater and surface

11  water has been recognized in federal law for over a century. *See Kansas*, 206 U.S. at 114 ("If the

12  bed of a stream is not solid rock, but earth, through which water will percolate, and, as alleged in

13  plaintiff's bill, the 'valley of the river in the state of Kansas is composed of sand covered with

14  alluvial soil,' undoubtedly water will be found many feet below the surface, and the lighter the

15  soil the more easily will it find its way downward and the more water will be discoverable by

16  wells or other modes of exploring the subsurface.").

17         The remaining question is whether certain groundwater pumping in fact interferes with

18  any decreed rights.  That is a question for another day.  As the Tribe notes, no such controversy is

19  currently submitted for decision.  But if the United States, the Tribe, or any other party were to

20  allege that groundwater pumping (by any person, including the United States or the Tribe)

21  impaired the complaining user's rights under the Decree, the Court would have jurisdiction to

22  determine the matter and enjoin the offending activity (or instruct the Water Master to count

23  pumped water against a user's surface water rights) if interference could be proved.

24  ///

25  ///

**CONCLUSION**

IT IS HEREBY ORDERED that the Motion to Dismiss (ECF No. 2160) is DENIED.

IT IS FURTHER ORDERED that the Motion to Dismiss (ECF No. 2161) and the Joinder (ECF No. 2164) thereto are GRANTED.

IT IS FURTHER ORDERED the Clerk shall enter Judgment and close the case.

IT IS SO ORDERED.

Dated this 28th day of May, 2015.

_____
ROBERT C. JONES
United States District Judge